New Eastwick Corporation, Appellant, *v.* Philadelphia Builders Eastwick Corporation.

Argued December 1, 1967. Before MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused June 3, 1968.

*Theodore Voorhees,* with him *Dechert, Price & Rhoads,* for appellant.

*John R. McConnell,* with him *H. Mark Solomon,* and *Morgan, Lewis & Bockius,* for appellee.

OPINION BY MR. JUSTICE O'BRIEN, April 16, 1968:

This is an appeal by New Eastwick Corporation [NEC], plaintiff in the court below, from a final decree of the Court of Common Pleas No. 2 of Philadelphia County, dismissing plaintiff's complaint in equity. Plaintiff sought to restrain defendant, Philadelphia Builders Eastwick Corporation [PBEC], from interfering with NEC's contractual rights under a Redevelop-

ment Agreement dated July 12, 1961 with the Redevelopment Authority of the City of Philadelphia [Authority].

By the terms of that agreement NEC agreed to purchase for the sum of $12,192,865 all of the residential land [Stages I, II, III and IV] in the Eastwick Urban Renewal Area of Philadelphia, subject to a thirty-months option in favor of PBEC to purchase Stage III and IV, amounting to approximately one-half of that land.[1] The option expired on January 12, 1964, and it was not exercised at that, or any later, time. Ten months later, during the month of October, 1964, PBEC presented the Authority with a "preliminary agreement" which would grant PBEC an entirely new option for the same stages covered by the original one. The date of expiration of this proposed option was three years later, however, i.e., on January 12, 1967. When plaintiff was finally told about this agreement and learned of the willingness of the Authority to execute it, it instituted this suit to restrain PBEC from interfering with its contractual rights to the land in question.

The case was heard by Judge ALESSANDRONI, who died before writing an adjudication. It was then agreed by counsel that Judge REIMEL be substituted for Judge ALESSANDRONI and that he should decide the case on the record of the hearing before Judge ALESSANDRONI. On July 18, 1966 Judge REIMEL entered his adjudication and a decree nisi dismissing the complaint. Exceptions were filed by NEC and dismissed on January 5, 1967, by a court en banc consisting of

---

[1] The option, if it had been exercised, would have given PBEC the right to construct the major shopping center in Stage II, most of Stage III and all of Stage IV. For convenience, throughout the case everyone has referred to the option as involving Stages III and IV.

Judges REIMEL, DOTY and REID. Plaintiff took this appeal from the court's final decree.

The court below dismissed the complaint because it found that the plaintiff had waived strict compliance with the time limitation of the option. It also concluded that plaintiff had failed to make a showing of irreparable injury. On this appeal appellant urges that on the undisputed facts there is no support for PBEC's claim that the time limitation was waived and that even if there were a waiver, that fact would not justify PBEC's later interference with the contractual rights of NEC. It is also urged that the proposed deprivation of NEC's right to redevelop the land in question constituted a clear instance of irreparable injury to the plaintiff.

The deadline for the exercise of the option was January 12, 1964. In the fall of 1963, PBEC indicated to the Authority that it would like to be given more time. Following some exploratory exchanges of views, representatives of NEC, PBEC and the Authority met together on December 3, 1963, not quite six weeks before the expiration of the option. Thomas, the local manager of NEC, thereupon made a proposal to extend the time in which PBEC would be required to enter into a redevelopment contract, provided that PBEC enter into a preliminary agreement and post a $150,000 bond immediately. He also stated as a condition to this offer that the Authority agree to certain additional matters respecting the industrial redevelopment of Eastwick. Thomas repeated his offer in writing in a letter to the Authority dated December 19, 1963. The Authority, which had been acting as go-between, failed to communicate Thomas' written offer to PBEC, and the latter, on January 10, 1964, two days before the option expired, wrote to the Authority asking that the

expiration date be set off until the unresolved matters be cleared away.

The court below based its decision mainly upon its conclusion that plaintiff had waived strict performance of the option by defendant. As support for his holding, the chancellor said in his adjudication: "Thomas nowhere in his testimony states categorically that plaintiff was going to insist on performance by defendant, as required, on or before January 12, 1964." Moreover, the chancellor emphasized Thomas' admission that the letter of December 19 was sent because he felt that he had not made his position clear as to the expiration of the option clause. In our view, the chancellor was under a mistaken impression as to where the burden lies when time is of the essence. And here, despite appellee's protestations to the contrary, time was indeed of the essence. Time is always of the essence in an option contract. *Phillips v. Tetzner,* 357 Pa. 43, 53 A. 2d 129 (1947); *Rhodes v. Good,* 271 Pa. 117, 114 A. 494 (1921). Although the word "option" is not used, it is clear that an option had been created, and the chancellor so concluded.[2]

The chancellor seemed to feel that NEC had the duty to inform PBEC that it (NEC) intended to insist on strict performance of the option. On the contrary, performance in accordance with the contract

---

[2] Paragraph 2g of the Redevelopment Agreement between NEC and the Authority provided: "In the event that the AUTHORITY and PHILADELPHIA BUILDERS EASTWICK CORPORATION shall not have entered into a Redevelopment Contract, and in the event that security in the amount of $150,000 shall not have been filed in connection therewith, within (30) months from the date of approval of REDEVELOPER by City Council of the City of Philadelphia, then, in such event, the provisions of subparagraphs b, c, d, and f [providing for the transfer to PBEC of approximately one-half of the entire Redevelopment area] of this Paragraph 2 shall become null and void."

terms (i.e., by January 12, 1964) is assumed, and a deviation is permissible only if NEC affirmatively assents to it. Inaction by NEC during negotiations to modify the contract can in no way be said to give PBEC permission to ignore the then existing terms of that contract. The case of *Cohn v. Weiss,* 356 Pa. 78, 51 A. 2d 740 (1947), relied upon by appellee and the court below, is distinguishable. In that case, a real estate settlement was set for December 26th, with time of the essence. As the date approached, complications developed in the nature of judgments against a person bearing the same name as the vendor, Weiss, and the illness of Weiss' son. Although the facts are in dispute as to when the vendee, Cohn, first informed Weiss that settlement had been set for December 29th and was told that Weiss would let him know, by Weiss' own testimony, he was told on December 26th about 4 P.M. that settlement would be on December 29th, and replied that he would let Cohn know in the morning. The next morning Weiss said that he would not go through with the settlement. In Cohn's suit for specific performance, this court quite properly ruled that there was an estoppel or implied waiver in view of the way that plaintiff was trapped. Weiss' statement on December 26th that he would let Cohn know in the morning clearly showed that he, Weiss, was not going to insist on the day originally set for settlement.

The same cannot be said for the actions of NEC in the instant case. In fact, the chancellor found not that NEC indicated that it was not going to insist on the January 12th date (as Weiss had done), but that NEC did not indicate that it was going to insist on January 12th. NEC was under no duty to act; so its failure to do so cannot be held against it.[3] In fact, even the

---

[3] We have assumed that NEC did indeed fail to act, but that is far from clear. In the letter of December 19, 1963, sent from

defendant realized that at one time. On January 10, 1964, the President of PBEC, one Joseph A. Singer, wrote to the Authority. In that letter appears the phrase "I would respectfully request that the date be set-off until the unresolved matters be cleared away." Had strict performance been waived by NEC, there would have been no need to ask the Authority (the wrong party to ask) to set back the date.

We should also like to point out that it would not even avail PBEC to prove a waiver of strict performance by NEC. For that would merely give PBEC a reasonable time in which to perform. And to this date, PBEC has not sought to exercise the option which by its terms expired January 12, 1964. Instead, it sought a new option, which the Authority had no power to grant, which expired January 12, 1967. Although the record does not reveal the present status of the option or options, under appellee's theory of the case, there would be nothing to prevent the Authority from granting it an option ad infinitum. Thus, even if there were a waiver of the January 12, 1964 date, that waiver did not give PBEC the right to sit on the fence indefinitely.

Although the chancellor alluded to the question of irreparable harm only peripherally, one of the reasons given by the court en banc for denying relief was the absence of any irreparable harm to plaintiff. We can-

---

Thomas of NEC to the Authority, Thomas indicated that NEC required PBEC to execute a preliminary agreement on or before January 12, 1964, if strict performance of the option was to be waived. It is true that this letter was not transmitted to PBEC by the Authority, but it would seem that PBEC has little call to complain about that. PBEC initiated negotiations for modification on September 3, 1963, by writing to the Authority rather than to NEC, and appears to have constituted the Authority its agent for these negotiations. However, we have seen that it is unnecessary to rely on this letter to show that there was no waiver of strict performance by NEC.

not agree with that conclusion. Upon the expiration of the option, NEC had equitable title to the land in Stages III and IV. In light of the unique and intrinsic value of land, interference with the plaintiff's contractual rights to ownership of that land must be deemed irreparable harm.

Appellee makes several other arguments as to why we should deny the requested relief. None of these contentions is tenable and we shall dispose of them briefly. PBEC relies upon an alleged contract between NEC and PBEC on February 15, 1961, which contract it feels requires NEC to permit PBEC to redevelop Stages III and IV. Even if this unsigned informal document be deemed a contract, it is clear that it was superseded by the later Redevelopment Contract of July 12, 1961. Singer, PBEC's president, admitted that PBEC had hoped to have a contract of its own for Stages III and IV, but he testified that the Authority had determined that appellee's "interest in the area be a part of the contract that was drawn up between New Eastwick Corporation and the Redevelopment Authority." Inasmuch as NEC and PBEC were powerless to bind the Authority, *Kuhn v. Buhl,* 251 Pa. 348, 96 A. 977 (1916); *Borden v. Ellis,* 158 Pa. Superior Ct. 259, 44 A. 2d 530 (1945), the most logical interpretation of the alleged contract is a mere memorandum of how the Authority intended to divide the area.

Nor does appellee's allegation that plaintiff itself was in default impress us. The alleged default was in NEC's failure to enter into an Industrial Development Contract with the Authority. There is no proof whatsoever that such failure constituted a default. The chancellor disposed of this argument by PBEC as follows: "The latest theory advanced by defendant that plaintiff has breached some other contract provision with Authority and that this somehow offsets defend-

54

ant's admitted failure to perform is somewhat less than impressive and merits no further consideration."

Finally, appellee's forfeiture argument is not sustainable. Much of the money spent by appellee was in preparation for its losing bid for a complex undertaking. Moreover, appellee was in the favored position of being able to sit on the fence for thirty months before being required to commit more than a comparatively small sum viewed in light of the total value of the development. It is hardly becoming for appellee to urge us to allow it to straddle the fence ad infinitum when any loss it occasioned was through its failure to exercise its option in a timely manner, or at all, for that matter.

Decree vacated and case remanded to the court below with instructions to enter a decree granting the relief prayed for. Costs to be borne by appellee.

Mr. Justice JONES and Mr. Justice ROBERTS concur in the result.

Mr. Justice COHEN dissents.

Mr. Chief Justice BELL took no part in the consideration or decision of this case.